**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

Wendy's International, Inc., et al.,

    Plaintiffs,

                                    Case No. 2:05-cv-803

    v.

                                      JUDGE GRAHAM

Illinois Union Insurance Company,

    Defendant.

**Opinion and Order**

    Plaintiffs Wendy's International, Inc. ("Wendy's") and its wholly-owned subsidiary, Triune Corporation ("Triune") (collectively, "Plaintiffs") seek a declaratory judgment pursuant to 28 U.S.C. § 2201, and damages for breach of contract and insurer bad faith against Defendant Illinois Union Insurance Company ("Illinois Union"). Plaintiffs assert that Illinois Union was obligated to defend, indemnify and reimburse them for all sums and losses incurred from an arbitration in which Triune was a respondent, and pay all judgments or settlements that Plaintiffs paid or would be obligated to pay resulting from that arbitration. This matter is before the Court on Illinois Union's Motion for Summary Judgement (Doc. 27).

    Pursuant to an Agreed Order dated April 14, 2006, Illinois Union's Motion pertains only to its third affirmative defense, namely that Plaintiffs' failure to satisfy the notice requirement in the insurance policy bars their claims in this action (Doc. 25).

**I.**   **Summary Judgment Standard**

    Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." LaPointe v. United Autoworkers Local 600, 8 F.3d 376, 378 (6th Cir. 1993). The movant must show that there are no genuine issues of material fact in the case. Id. The moving party may meet its burden by showing that the nonmoving party lacks evidence to support an essential element of its case. Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A., 12 F.3d 1382, 1389 (6th Cir. 1993).

In response, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J. C. Bradford & Co., 886 F.2d 1472, 1476 (6th Cir. 1989) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986)). The Court must view the evidence, all facts, and any inferences that may permissibly be drawn from the facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). See also Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992).

In reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Patton v. Bearden, 8 F.3d 343, 346 (6th Cir. 1993)(quoting Anderson, 477 U.S. at 251-52). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion

for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson, 477 U.S. at 247-48 (emphasis in original); see generally Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1310 (6th Cir. 1989).

Thus, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. See also Gregory v. Hunt, 24 F.3d 781, 784 (6th Cir. 1994). A district court considering a motion for summary judgment may not weigh evidence or determine credibility. Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994).

## II. Facts

The facts in this insurance coverage case are largely undisputed. Wendy's is an Ohio corporation with its principal place of business in Dublin, Ohio. In June of 2002, Wendy's acquired all of the shares of Fresh Enterprises, Inc. ("Fresh Enterprises"), a California corporation and a wholly-owned subsidiary of Wendy's. Triune, also a California corporation with its principal place of business in Thousand Oaks, California, is a wholly-owned subsidiary of Fresh Enterprises. Illinois Union is an insurance company eligible as a surplus-lines insurer in Ohio and organized, incorporated, and domiciled in Illinois.

### A. The Insurance Policy

The subject of this dispute is a "Miscellaneous Errors and Omissions Liability Insurance" policy, numbered EON G21639175 002 ("the Policy") that Wendy's purchased from Illinois Union. The Policy was effective from June 30, 2003 through June 30, 2004 and lists Wendy's as the "Named Insured." Wendy's paid a $280,225.00

premium for the Policy.  The Policy was a renewal of policy number
EON G21639175 001.  Wendy's renewed the Policy with policy number
EON G21639175 003, covering June 30, 2004 through June 30, 2005.

The Policy offered coverage of up to $15 million on sums in
excess of the $500,000 per claim deductible "that the Insured shall
become legally obligated to pay as Damages and Claims Expenses
because of a Claim first made against the Insured during the Policy
Period by reason of a Wrongful Act[1] in the performance of or
failure to perform Professional Services by the Insured or by any
other person or entity for whom the Insured is legally liable[,]"
where the "Wrongful Acts [were] . . . committed on or subsequent to
the Retroactive Date specified in Item 6 of the Declarations and
before the end of the Policy Period."  The Retroactive Date listed
in Item 6 is May 21, 1996.

The Policy defines a Claim as "a written demand for money,
including any civil proceeding against the Insured for a Wrongful
Act, in the performance of or failure to perform Professional
Services."  The Policy defines a "Related Claim" as "all Claims
arising out of a single Wrongful Act or a series of Related
Wrongful Acts in the performance of or failure to perform
Professional Services."  Related Wrongful Acts are defined as "all
Wrongful Acts that are temporally, logically or causally connected
by any common fact, circumstance, situation, transaction, event,
advice or decision."  According to the Policy, "[a]ll Related

---

[1]

The Policy defines "wrongful act" as "any actual or alleged act, error,
omission, misstatement, misleading statement, Personal Injury, neglect or breach
of duty by the Insured in their capacity as such or by any other person or entity
for whom the Insured is legally liable."

Claims shall be deemed a single Claim, and such Claim shall be deemed to be first made on the date the earliest such Related Claim is first made against the Insured, regardless of whether such date is before or during the Policy Period."

The Policy also states that, "[t]he Company shall have the right and duty to defend any covered Claim brought against the Insured even if the Claim is groundless, false or fraudulent . . . . [t]he Insured shall not admit or assume liability or settle or negotiate to settle any Claim or incur any Claims Expense without the prior written consent of the Company and the Company shall have the right to appoint counsel and to make such investigation and defense of a Claim as it deems necessary."

The Policy states on the declarations page and again on the first page of the Policy: "NOTICE: THIS IS A CLAIMS MADE POLICY. THIS POLICY APPLIES ONLY TO THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND ARE THE RESULT OF WRONGFUL ACTS COMMITTED ON OR SUBSEQUENT TO THE RETROACTIVE DATE SPECIFIED IN ITEM 6 OF THE DECELERATIONS AND BEROE THE END OF THE POLICY PERIOD."  The Policy states it is, "subject to the Declarations and the limitations, conditions, provisions and other terms of the Policy[.]"

In a section labeled "Conditions, Notice of Claims," the Policy states, "[t]he Insured, as a condition precedent to the obligations of the Company under this Policy, shall give written notice to the Company immediately, but in no event later than 60 days after the end of the Policy Period of any Claim made against the Insured."

Finally, the Policy provides, "[n]o action shall be brought

against the Company, unless, as a condition precedent thereto, the Insured shall have fully complied with all the terms of this Policy[.]"

**B.   The "Fresh Start" Arbitration**

On April 16, 2004, James Essington ("Essington") and Fresh Start Enterprises, Inc. ("Fresh Start"), a Kansas corporation, filed a demand for arbitration with the American Arbitration Association against Triune, the franchisor of Baja Fresh restaurants.  The claimants alleged causes of action against Triune for violations of the Kansas Consumer Protection Act and the Missouri Merchandising Practices Act, fraudulent misrepresentation, and negligent misrepresentation.  These claims arose from Triune's allegedly misleading statements and failure to disclose key information that induced Essington to enter into an agreement to develop twelve Baja Fresh restaurants in Kansas and Missouri. These franchises did not achieve the sales allegedly represented by Triune and instead incurred losses.

Triune denied the allegations and asserted defenses and counterclaims.  Triune retained the law firm of Jenkens and Gilchrist, LLP, to represent it, and the case was principally handled by attorneys Keith Klein ("Klein") and Kenneth Costello.

In December 2004, Essington filed a separate lawsuit in the Superior Court of California (the "California lawsuit") against the then President of Triune, Greg Dollarhyde, containing allegations against Dollarhyde that were nearly identical to those in the Fresh Start Arbitration.  In January, 2005, Wendy's notified Illinois Union of the California lawsuit.

It is undisputed that notice of the Fresh Start Arbitration

6

was not given until early 2005,[2] well after the expiration of the sixty day period outlined in the notice provision following the expiration of the Policy on June 30, 2004.  Wendy's on behalf of Triune and all other insureds ultimately provided a copy of the claimants' Statement of Claim in the Fresh Start Arbitration to Illinois Union.

In his declaration, Klein testified that he spoke with Rose on March 9, 2005.  According to Klein, Rose informed him that Illinois Union would provide insurance coverage for Triune in the California Lawsuit and the Fresh Start Arbitration, subject to a reservation of its rights regarding the untimely notice, but that Illinois Union "didn't care" about the untimely notice.  (Appx. of Exs. in Supp. of Joint Mem. of Plfs. in Opp. to Def.'s Mot. for Summ. J., Ex. 4, Klein Decl. ¶ 15.)

In a letter dated March 10, 2005, Rose informed Randy Morgret, a Wendy's Claim Manager, that pursuant to the definitions in the Policy, the Fresh Start Arbitration and the California lawsuit were Related Claims, and thus deemed a single Claim by Illinois Union with a single limit of liability and deductible.

The letter also stated that under the Policy, the Claim was first filed on the date the Fresh Start Arbitration demand was filed, April 16, 2004.  However, because "ACE did not receive a

---

[2]

Wendy's contends that in January of 2005, Justin Rose ("Rose"), the claims specialist from ACE USA assigned to handle the California lawsuit by Illinois Union, spoke with Klein and they discussed both the California lawsuit and the Fresh Start Arbitration.

Illinois Union counters that it did not receive notice of the Fresh Start Arbitration until February 9, 2005, when Rose received copies of the Arbitration demand.  Regardless of exactly when Illinois Union became aware of the Fresh Start Arbitration, it was not until early 2005.

copy of this [Fresh Start Arbitration] Demand until February 9, 2005[,] [t]he Company reserves all rights with respect to this untimely notice." (Manougian Decl. in Supp. of Def.'s Mot. for Summ. J., Ex. 7.) On March 17, 2005, Essington dismissed the California lawsuit with prejudice, leaving only the Fresh Start Arbitration pending.

Rose sent Morgret a follow-up letter dated July 25, 2005, which continued to reserve all of Illinois Union's rights in light of Plaintiffs' "failure to report the claim in the policy period during which it was first made, a predicate of coverage under the insuring agreement." (Appx. of Exs. in Supp. of Joint Mem. of Plfs. in Opp. to Def.'s Mot. for Summ. J., Ex. 1C, Rose Dep., Ex. 16, Mar. 7, 2006.) In his deposition, Rose testified that on Friday, August 12, he reiterated the coverage issues discussed in the initial reservation of rights letter and the follow-up letter in a conversation with Mark Inzetta from Wendy's legal department.

On August 12, Rose also e-mailed a "Claim Loss Report" ("CLR") regarding the Fresh Start Arbitration to his supervisor at ACE USA, Stacey Woody ("Woody"). The CLR anticipated a "25% contribution to a settlement in the 2 million range." (Appx. of Exs. in Supp. of Joint Mem. of Plfs. in Opp. to Def.'s Mot. for Summ. J., Ex. 1C, Rose Dep., Ex. 22.) When asked how the twenty-five percent was decided, Woody testified in her deposition:

> A. Well, I recall that putting aside the notice issue, because that, in my opinion, is a clear denial. The other–
> Q. You didn't deny it?
> A. No, but that involves other factors that we were factoring in. For this document [the CLR], putting aside the denial position on the notice, the other coverage issues that we had, we knew there were significant coverage issues.

(Appx. of Exs. in Supp. of Joint Mem. of Plfs. in Opp. to Def.'s Mot. for Summ. J., Ex. 1D, Woody Dep. 77: 3-13, Mar. 8, 2006).

Plaintiffs engaged in various settlement negotiations with the claimants in the Fresh Start Arbitration of which they notified Illinois Union. The evidentiary hearing in the Fresh Start Arbitration was scheduled to begin on August 25, 2005. Illinois Union was aware of this as well, but did not have a representative present at the hearing.[3] Prior to the hearing, Plaintiffs reached an agreement with the claimants to settle the Fresh Start Arbitration. It is undisputed that Illinois Union did not approve the settlement, though Plaintiffs assert that they notified Illinois Union of the offer and it failed to timely respond. Illinois Union asserts that its agreement with the settlement was not reasonably sought.

Plaintiffs argue that the Policy obligated Illinois Union to furnish a complete defense to Triune for the Fresh Start Arbitration, to indemnify Triune for all costs of such defense, and to indemnify Triune for any and all payments, expenditures, damages, and settlements or other considerations that were incurred during the Fresh Start Arbitration. Subject to the reservation of its rights, Illinois Union contends it provided Triune with a defense in the Fresh Start Arbitration.

III. **Choice of Law**

The Policy does not provide which state's substantive laws

---

[3]

Rose testified in his deposition that he wanted to attend the Fresh Start Arbitration but that Plaintiffs requested that Illinois Union not have a representative present.

govern its interpretation. Illinois Union contends that under Ohio's choice-of-law principles, Ohio law should apply because it has the most significant relationship to this dispute. Plaintiffs, also applying Ohio's choice-of-law provisions, contend that California law should apply because it bears the most significant relationship to this dispute as it was the location of Triune's business operations.

The parties are correct that, as the forum state, Ohio's choice-of-law provisions apply, should a choice-of-law determination be necessary. Rosen v. Chrysler Corp., 205 F.3d 918, 921 n.2 (6th Cir. 2000). However, if two jurisdictions apply the same law, or would reach the same result applying their respective laws, a choice of law determination is unnecessary because there is no conflict, and the laws of the forum state apply. Mecanique C.N.C., Inc. v. Durr Envtl., Inc., 304 F. Supp. 2d 971, 957 (citing Akro-Plastics v. Drake Inuds., 685 N.E.2d 246, 248 (Ohio Ct. App. 1996)). The party seeking to apply the foreign law bears the burden of showing that the foreign law is different from the local law: "[w]here the party seeking application of the law of a foreign jurisdiction fails to demonstrate a conflict between local law and the law of that jurisdiction, local law . . . governs." Id. (citing Gouge v. BAX Global, Inc., 252 F. Supp. 2d 509, 521 (N.D. Ohio 2003) (citations omitted)).

Here, Plaintiffs, seeking to apply California law, have the burden of showing that California law is different than Ohio law. Not only have Plaintiffs not pointed to any material differences between California law and Ohio law on this issue, Plaintiffs argue that both California and Ohio have adopted the "notice-prejudice"

10

rule bearing on the issue of whether courts must inquire as to whether an insurer was prejudiced by late or untimely notice before determining that coverage is precluded on such basis.

Because Plaintiffs have failed to show how California law differs from Ohio law, and because the Court has not found any material differences in the states' respective laws, the Court will not engage in a choice-of-law analysis and will apply the laws of the forum state, Ohio, to this dispute.

**IV.  Analysis**

In its Motion, Illinois Union argues that insurance coverage is precluded because Plaintiffs failed to comply with the notice provision of the Policy.  Plaintiffs counter that Illinois Union should not receive a "windfall" based on a "technical" violation of the notice provision of the Policy because no prejudice resulted to Illinois Union from the untimely notice; therefore under the "notice-prejudice" rule, coverage is not precluded.  Plaintiffs argue that this Court should distinguish between the notice condition precedent in the contract and a material reporting requirement.

Plaintiffs further contend that Illinois Union waived, or is estopped from asserting, a late notice defense, due to its agent's alleged comments that Illinois Union "didn't care" about the late notice.  These arguments will be discussed in turn.

**A.    The Notice-Prejudice Rule**

As the Sixth Circuit has observed, under Ohio law, "[i]n determining the plain meaning of an insurance contract, the contract should be read as a whole, and each word given its appropriate meaning, if possible."  United States v. A.C. Strip,

11

868 F.2d 181, 185 (6th Cir. 1989) (quoting <u>Burdett Oxygen Co. of Cleveland v. Employers Surplus Lines Ins. Co.</u>, 419 F.2d 247, 248 (6th Cir. 1969)). "Where a policy is ambiguous, it is to be liberally construed in favor of the insured." <u>Id</u>. (citing <u>Fuerstenberg v. Mowell</u>, 409 N.E.2d 1035, 1036 (Ohio Ct. App. 1978)). This rule, however, is inapplicable if the result of its application would be an unreasonable or forced interpretation of the contract or would result in an extension of coverage. <u>Id</u>. (citations omitted); <u>see</u> <u>West v. McNamara</u>, 111 N.E.2d 909, 913 (Ohio 1953) (noting that the "universal rule that insurance policies are to be construed strictly in favor of the insured . . . is not applicable to extend the coverage of the policy to absurd lengths").

Turning to this insurance contract, the parties maintain that this is a "claims-made" policy. A "claims-made" policy is distinct from an "occurrence" policy. An occurrence policy premises coverage on the occurrence of an event, regardless of when the claim against the insured resulting from that event is made; a claims-made policy premises coverage on a claim that is made against the insured during the policy period. <u>A.C. Strip</u>, 868 F.2d at 185. (citing <u>Mominee v. Scherbarth</u>, 503 N.E.2d 717 (1986)).

The Sixth Circuit has further noted, "[c]laims made policies, unlike occurrence policies, are designed to limit liability to a fixed period of time." <u>Id</u>. at 187. "To allow coverage beyond that period would be to grant the insured more coverage than he bargained for and paid for, and to require the insurer to provide coverage for risks not assumed." <u>Id</u>.

Plaintiffs distinguish claims-made policies from "claims-made-

12

and-reported" policies, where coverage begins only when a claim against the insured is made <u>and</u> the insured reports the claim to the insurer within the confines of the policy period. <u>See</u> <u>e.g.</u>, <u>id</u> at 185. (noting that the language in the policy specifically stated coverage would be for "'claims first made against the insured and reported to the Company during the Policy Period'"). Plaintiffs argue that in this case, coverage was only premised on a claim being made against the insured within the policy period, not on the reporting of that claim to the insurer. According to Plaintiffs, the Policy had no true reporting requirement.

Plaintiffs argue that Ohio courts follow the modern trend of applying the notice-prejudice rule to insurance contracts with no reporting requirement: untimely notice may be excused absent prejudice to the insurer resulting from the late notice. Illinois Union maintains that while Ohio courts apply the notice-prejudice rule in certain contexts, for example to policies that are based on prompt notification after the occurrence of an event, the rule does not apply to insurance contracts such as this one where notice of a claim must be given by a specific date, whether or not that date is the last date of the policy or whether it is extended by the terms of the policy. Because the Policy states that notice of a claim must be given within a reasonable amount of time but under no circumstances later than sixty days after the expiration of the Policy on June 30, 2004, Illinois Union argues that the notice-prejudice rule does not apply to the Policy, and that consequently the notice provision must be strictly enforced.

Illinois Union contends that the Sixth Circuit's opinion in <u>Torello v. UNUM Life Ins. Co. of Am</u>., No. 98-4338, 1999 U.S. App.

LEXIS 32228 (6th Cir. Dec. 3, 1999) is instructive.  In <u>Torello</u>, the Sixth Circuit upheld the district court's grant of summary judgment in favor of an insurer whose policy stated that notice of a disability claim must have been given within thirty days after the disability was sustained.  <u>Id</u>. at **14-15.  The court found that Torello failed to comply with the specific time limit for proving his disability claim, and noted that "Ohio law provides no refuge from the consequences the policy explicitly imposes under such circumstances." <u>Id</u>. at *16.  Torello specifically argued that Ohio's adoption of the notice-prejudice rule prevented UNUM from denying his disability benefits claim due to untimely notice.  <u>Id</u>. at *14.  The court concluded that "the Ohio Supreme Court considers prejudice relevant only when an insurance policy calls for 'prompt' or 'immediate' notice.  <u>Id</u>. (citing <u>Am. Employers Ins. Co. v. Metro Reg'l Transit Auth.</u>, 12 F.3d 591, 597 (6th Cir. 1993)).[4] "Ohio law . . . does not suggest that prejudice has any significance as to whether an insurer may enforce a specific time limit set forth in an insurance policy." <u>Id</u>. at *15.  Though the policy at issue in <u>Torello</u> is not identical to that in this case, the reasoning of the Sixth Circuit and its analysis of Ohio insurance contract law is applicable to the facts before the Court.

Plaintiffs argue that <u>Torello</u> is inapplicable, having been decided under the traditional approach whereby prejudice to the

---

[4]

In <u>American Employers</u>, 12 F.3d 591, 597 (6th Cir. 1993), the Sixth Circuit surveyed Ohio law regarding the effect of untimely notice on insurance coverage. The court determined that where a notice provision called for "prompt" or "immediate" notice of an occurrence or claim, "the insured must act within a reasonable time."  The court then inferred from Ohio case law that reasonableness is to be determined in light of the facts and circumstances of a particular case, including "any prejudice that may have resulted from delay on the part of the insured." <u>Id</u>.

insurer was not considered, a framework that Plaintiffs argue was rejected by the Ohio Supreme Court in <u>Ferrando v. Auto-Owners Mut. Ins. Co.</u>, 781 N.E.2d 927 (Ohio 2002).  The uninsured motorist policy at issue in <u>Ferrando</u> provided that the insured must give "prompt notice" of any accident, claim, suit, or lost to the insurer.  <u>Id</u>. at 932.  The court distinguished the "traditional approach," where a minority of jurisdictions "find . . . that in those states a breach of a policy provision (such as a prompt-notice clause) by an insured seeking UIM coverage automatically relieves the UIM insurer of the obligation to provide coverage," from the "modern trend," followed by the majority of states, where a breach of a notice provision is only material "when the insurer is prejudiced by the breach."  <u>Id</u>. at 933.

After a comprehensive review of case law from Ohio and other jurisdictions, the court concluded that "when an insurer's denial of UIM coverage is premised on the insured's breach of a <u>prompt-notice provision</u> in a policy of insurance, the insurer is relieved of the obligation to provide coverage if it is prejudiced by the insured's unreasonable delay in giving notice."  <u>Id</u>. at 945 (emphasis added).  Importantly, two main cases from other jurisdictions on which the Ohio Supreme Court relied illustrating the notice-prejudice rule, <u>Alcazar v. Hayes</u>, 982 S.W.2d 845, 847 (Tenn. 1998) and <u>Clementi v. Nationwide Mut. Fire Ins. Co.</u>, 16 P.3d 223 (Col. 2001), involved prompt-notice UIM provisions, not provisions that required the insured to give notice within a specified amount of time.

While the notice-prejudice rule has been adopted by the Ohio Supreme Court, the circumstances under which the court applied the

15

rule in <u>Ferrando</u> are distinguishable from those in <u>Torello</u>.  The Ohio Supreme Court's decision in <u>Ferrando</u> is not controlling under these circumstances because the insurance policy in that case did not include a specific date by which the insured was to notify the insurer of any claim or occurrence.  Rather, the policy provided that notice of the occurrence should be provided to the insurer "promptly."

Plaintiffs argue that the notice-prejudice rule applies to claims-made policies such as the Policy in this case.  However, the majority of cases to which Plaintiffs cite for this proposition involve policies, whether identified as "claims-made" or "occurrence," that require immediate or prompt notice, not notice by a certain deadline.  <u>See</u> <u>Pension Trust Fund v. Fed. Ins. Co.</u>, 307 F.3d 944, 956 (9th Cir. 2002) (the policy at issue was a "claims-made policy with no reporting requirement[,] . . . requir[ing] that PTF provide notice of claims 'as soon as practicable'[;] [i]t did not require that the claims be reported within the policy period, or even within a specific number of days thereafter"); <u>Butcher v. Gulf Ins. Co.</u>, No. C 03 -3553 PJH, 2005 U.S. Dist. LEXIS 20562 at **40-41 (Jun. 15, 2005 N.D. Cal.) (the notice-prejudice rule applied to a claims-made policy with no reporting requirement, but not to a claims-made-and-reported policy prefacing coverage on claim first made and reported during the policy period); <u>Ormet Primary Aluminum Corp. v. Employers Ins. of Wausaw</u>, 725 N.E.2d 646, 655 (Ohio 2000) (holding that "notice to the insurer 'as soon as practicable' requires notice within a reasonable time in light of the surrounding facts and circumstances"); <u>IMCERA Group, Inc. v. Liberty Mut. Ins. Co.</u>, 50

16

Cal. Rptr. 2d 583, 598-99 (Cal. Ct. App. 1996) (despite the insurance policy being a hybrid between an occurrence and claims-made policy, the language of the policy requiring notice within a year after a triggering event was not ambiguous); Xebec. Dev. Partners, Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, P.A., 15 Cal Rptr. 2d 726, 740-41 (Cal. Ct. App. 1993) (inquiring as to prejudice to the insurer where the claims-made policy required notice to be given as soon as practicable as a condition precedent to coverage).

Plaintiffs distinguish the Policy from a claims-made-and-reported policy that premises coverage on the reporting of claims before the policy expires. However, the fact that the Policy is not titled a "claims-made-and-reported" policy does not negate the reporting requirement contained in the notice provision. See Janjer Enterprises, Inc. v. Executive Risk Indem., Inc., 97 Fed. Appx. 410, 415 (4th Cir. 2004) ("while placing a reporting requirement in a policy's declaration page or insuring agreement is one manner in which parties can create a 'claims made and reporting' policy, it is not the exclusive manner. Parties may also create a 'claims made and reporting' policy . . . by expressly providing in a policy's . . . terms and conditions.). The essence of a claims made policy is a certain reporting "cut-off date," regardless of whether the date is the final day of the policy or an extended date as allowed by the policy. Asp v. Ohio Med. Transp., Inc., No. 00AP-958, 2001 Ohio App. LEXIS 2865 at *7 (Ohio Ct. App. Jun. 28, 2001) (citing Checkrite Ltd., Inc. v. Illinois Nat'l Ins. Co., 95 F. Supp. 2d 180, 191-192 (S.D.N.Y. 2000)).

Reading the contract as a whole, the notice provision in the

17

Policy provides a strict reporting requirement. Accordingly, the Court finds that Plaintiffs were required to strictly comply with the notice provision of the contract, and the notice-prejudice rule does not apply to the Policy. Plaintiffs failure to comply with the Policy's notice provision bars recovery.

**B. Waiver**

Plaintiffs also argue in their opposition to Illinois Union's Motion that Illinois Union waived, or is estopped from asserting, the late notice defense because Rose allegedly told Klein that Illinois Union really "didn't care" about the late notice. Plaintiffs also cite to the deposition testimony of Rose's superior, Stacey Woody, who stated that Illinois Union put aside the notice issue when determining how much money to propose to contribute to any settlement of the Fresh Start Arbitration because of its relationship with Wendy's, and that Illinois Union did not deny coverage based on other factors in the situation, including Illinois Union's relationship with Wendy's.

As Illinois Union points out and Ohio courts have recognized, there is a "general rule that the doctrines of waiver and estoppel may not be used to expand an insurance policy's coverage," unless an insurer "'voluntarily relinquishes a known right or induces another into changing his position based upon reliance on the insurer's conduct when the insured is prejudiced by such reliance.'" Guideone Mut. Ins. Co. v. Reno, No. 01-CA-68, 2002 Ohio App. LEXIS 2162, *14 (Ohio Ct. App. Apr. 26, 2002) (quoting Turner Liquidating Co. v. St. Paul Surplus Lines Ins. Co., 638 N.E.2d 174, 179 (Ohio Ct. App. 1994)). Thus, waiver and estoppel are only applicable to insurance cases "'where there is a clear

18

misrepresentation of fact or when the insurer provides a defense without reserving its rights for a period sufficient to prejudice the insured's ability to conduct its own defense.'" Id. at *15 (quoting Turner, 638 N.E.2d at 179).

The evidence in this case, viewed in the light most favorable to Plaintiffs, does not demonstrate that Illinois Union voluntarily relinquished a known right or induced Plaintiffs into changing their position in reliance upon Illinois Union's conduct.  In his affidavit, Klein testified that he spoke with Rose on the telephone on March 9, 2005 and Rose told him that "Illinois Union would provide insurance coverage for Triune in both the Lawsuit and the Arbitration, subject to a 'reservation of rights' letter," and that though "Illinois Union's letter would reserve its rights regarding untimely notice of the Arbitration, Mr. Rose also said that Illinois Union 'didn't care' about the untimely notice."  (Joint Mem. of Plfs.' in Opp., Ex. 4, Klein Decl., ¶15).  Illinois Union did issue a reservation of rights letter on March 10, 2005, just a few weeks after first learning of the Fresh Start Arbitration.

The few week delay between when Illinois Union first learned of the Fresh Start Arbitration and when it reserved its rights pursuant to its March 10, 2005 letter, did not cause Plaintiffs any prejudice in conducting Triune's defense in the Fresh Start Arbitration.  Additionally, there is no indication that Plaintiffs were prejudiced or compromised by Rose's alleged comment that Illinois Union "didn't care" about the late notice, as that comment was followed by a reservation of rights letter that explicitly stated "[t]he Company [Illinois Union] reserves all rights with respect to this untimely notice."  In his own affidavit testimony,

Klein acknowledges that Rose told him Illinois Union would be issuing such a letter regarding the notice issue.  This reservation of rights letter was in turn succeeded by a follow-up letter from Rose dated July 25, 2005, just one month prior to the scheduled start date of the Fresh Start Arbitration, which stated that "Illinois Union continues to reserve all rights based on the failure to report the claim in the policy period during which it was first made, a predicate of coverage under the insuring agreement." (Appx. of Exs. in Supp. of Joint Mem. of Plfs. in Opp. to Def.'s Mot. for Summ. J., Ex. 1C, Rose Dep., Ex. 16).

Finally, Woody's deposition testimony is not as clear on the issue of waiver or estoppel as Plaintiffs would have the Court believe.  Woody stated that Illinois Union set aside the notice issue for purposes of determining a contribution amount for the CLR.  She stated that the lack of notice or untimely notice was a basis for denial, but that at the time Illinois Union's estimated contribution was computed for the purposes of the CLR, they put "aside the denial position on the notice, [and] the other coverage issues that we had."  She stated that Illinois Union did not deny coverage, and in the context of the deposition it is clear that Illinois Union indeed did not deny coverage at the time Rose drafted the CLR on or about August 15, 2005.  This testimony does not indicate any waiver on Illinois Union's part.  Nor does it indicate that Illinois Union should be estopped from asserting the untimely notice defense due to Plaintiffs' alleged detrimental reliance on Illinois Union's position.

The cases Plaintiffs cite, <u>Blecher & Collins, P.C. v. Northwest Airlines, Inc</u>., 858 F. Supp. 1442 (C.D. Cal. 1994) and

Ohio v. Sisler, 683 N.E.2d 106 (Ohio Ct. App. 1995) are inapposite, as neither deal with waiver or estoppel within the context of an insurance contract.  In Blecher, the court stated in dicta that a hypothetical statement to the effect of "we know that some conflicts might arise, but we don't care what they might be," could purport to waive conflicts a law firm had with representing different airlines simultaneously, but even then a client could not knowingly waive an unknown conflict.  Blecher, 858 F. Supp. at 1456 n.17.  In Sisler, the court examined whether an intoxicated individual could have effectively given consent to have his blood alcohol level tested by screaming, "I don't care what the f*** you do," to a police officer.  Sisler, 683 N.E.2d at 108.  As such, this Court finds Plaintiffs' waiver and estoppel argument unavailing.

**V.    <u>CONCLUSION</u>**

For the forgoing reasons, Illinois Union's Motion for Summary Judgment is GRANTED.  The Clerk of Court shall enter final judgment in this matter in Illinois Union's favor according to this Order, dismissing Plaintiffs' complaint with prejudice.  Costs shall be taxed against Plaintiffs.

It is so ORDERED.


<u>s/James L. Graham</u>
JAMES L. GRAHAM
United States District Judge

DATE: March 6, 2007

21